Reid A. Muoio (RM 2274)
Cheryl J. Scarboro
Tracy L. Price
Denise Hansberry

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC  20549-6030
(202) 551-4403 (Scarboro)



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CHEVRON CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

JUDGE STEIN

COMPLAINT

07 CV 10299

Civil Action No. _____

Plaintiff, United States Securities and Exchange Commission (the "Commission"), alleges that:

## NATURE OF THE ACTION

1.    From approximately April 2001 through May 2002, Chevron Corporation violated the books and records and internal controls provisions of the Foreign Corrupt Practices Act (the "FCPA") when third parties with which Chevron contracted made approximately $20 million in illegal surcharge payments in connection with Chevron's purchases of crude oil under the United Nations Oil for Food Program.  The third parties paid kickbacks to Iraq in the form of surcharges on shipments of crude oil from Iraq's

State Oil Marketing Organization ("SOMO").  Chevron knew or should have known that third parties paid a portion of the premiums they received from Chevron to Iraq as illegal surcharges.  Chevron knew that surcharge payments were prohibited by the Oil for Food Program and U.S. and international trade sanctions on Iraq.

2.      The Oil for Food Program provided humanitarian relief to the Iraqi population during the time that Iraq was subject to international trade sanctions.  The program required that all payments for Iraqi crude oil be made to a United Nations escrow account, so that Iraq could purchase necessary humanitarian goods.  The surcharges paid by third parties in connection with Chevron's purchases of oil bypassed the escrow account and were instead paid to Iraqi-controlled accounts at banks in Jordan and Lebanon.

3.      In purchasing Iraqi crude oil from third parties, Chevron paid a premium above the Official Selling Price ("OSP") established by the United Nations and SOMO. Chevron failed to accurately record in its books and records the approximately $20 million in surcharges that were included in the premiums.  Although Chevron took certain steps designed to prevent the purchase of Iraqi oil from third parties on which illegal surcharges had been paid, such procedures proved inadequate.  Thus, Chevron failed to devise and maintain a system of internal accounting controls to detect and prevent such illicit payments.

4.      As a result of this conduct, Chevron violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## JURISDICTION

5.     This Court has jurisdiction over this action pursuant to Exchange Act

Sections 21(d), 21(e) and 27 [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].  Chevron made use

of the mails or the means or instrumentalities of interstate commerce in furtherance of the

conduct alleged in this Complaint.

6.     Certain of the acts or transactions constituting the violations alleged in this

Complaint occurred within this judicial district, and venue is therefore proper under

Section 27 of the Exchange Act.  [15 U.S.C. § 78aa].

## DEFENDANT

7.     Defendant Chevron Corporation (including all predecessors and related

entities)  is a Delaware corporation with its headquarters in San Ramon, California.  The

company is involved in the production, processing, marketing and transportation of crude

oil, natural gas and petroleum products.  Chevron conducts business in the United States

and approximately 180 other countries.  It is registered with the Commission under

Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)] and its common stock trades on

the New York Stock Exchange under the symbol "CVX."  Chevron operates five oil

refineries within the United States, including two in California (the "West Coast

refineries").  During the relevant period, Chevron purchased approximately 78 million

barrels of crude oil from Iraq, primarily for use at its West Coast refineries.

## FACTS

### The United Nations Oil for Food Program

8.     On August 2, 1990, the government of Iraq, under Saddam Hussein,

invaded Kuwait.  Four days later the United Nations Security Council voted to enact U.N.

3

Resolution 661, which prohibited member states from trading in any Iraqi commodities or products. The United Nations continued to enforce these sanctions until 2003.

9.      On April 14, 1995, the United Nations Security Council adopted Resolution 986, which authorized the Government of Iraq to sell oil on the condition that the proceeds of all of its oil sales were deposited in a bank account monitored by the United Nations and used only to purchase designated humanitarian goods for the benefit of the Iraqi people. In May 1996, the Government of Iraq entered into a written Memorandum of Understanding to implement Resolution 986.

10.     The United Nations Office of Iraq Program, Oil for Food (the "Oil for Food Program" or "Program") was subsequently established to administer Iraq's sale of oil and its purchase of humanitarian goods. A special bank account was established at a bank in New York, New York (the "Oil for Food Escrow Account") to handle the transactions. The United Nations' economic sanctions on Iraq remained in place for all trade and transactions not authorized by the Oil for Food Program.

11.     The Government of Iraq, acting through SOMO, began selling oil pursuant to the Oil for Food Program in December 1996. Under the Program, Iraqi government officials had the power to select the companies and individuals who received the rights to purchase Iraqi oil. During every phase of the Oil for Food Program, high ranking Iraqi officials selected which companies and individuals would receive the rights to purchase certain quantities of Iraqi oil -- frequently referred to as "allocations" of oil -- at a certain price per barrel.

12.     A company that wished to buy oil could negotiate and enter into a contract with SOMO. The company then sought approval of the contract from the United

4

Nations. Once a contract was approved, the oil was loaded onto seagoing oil tankers. A company purchasing oil under the Program was required to pay the full amount of the contract price by means of a letter of credit from its bank in favor of the Oil for Food Escrow Account. No company was permitted to make payments for the oil, directly or indirectly, to Iraq outside the Escrow Account.

**Surcharge Demands by Iraqi Government Officials**

13.    From approximately August 2000 to March 2003, officials of the Iraqi government conditioned the distribution of allocations of oil under the Oil for Food Program on the recipients' agreement to pay kickbacks. The kickbacks were paid in the form of a surcharge on each barrel of oil sold. If a company did not agree to pay the required surcharge it did not receive oil allocations.

14.    SOMO officials directed where these surcharges were to be paid. Most of the surcharge payments were sent by wire to Iraqi-controlled accounts at banks in Jordan and Lebanon established in the names of SOMO officials or other Iraqi individuals. Money from these accounts was subsequently transferred to the Iraqi Central Bank in Baghdad.

15.    Iraqi officials demanded that oil customers pay surcharges ranging from $0.10 to as much as $0.50 per barrel in November 2000. In 2001, however, the surcharge demand was for between $0.25 and $0.30 per barrel. In order to allow oil buyers to receive a sufficient profit margin from which to pay the surcharge, SOMO proposed below-market prices for the oil.

16.    In the Fall of 2000, the United Nations 661 Committee received reports of Iraqi surcharge demands, which Iraqi government officials denied. The Committee

5

advised oil traders that it was illegal to make any such payments. Chevron was notified as early as December 2000 that it was illegal to make any such payments.

17.    To eliminate Iraq's opportunity to demand surcharges, the 661 Committee imposed "retroactive pricing" on Iraqi crude oil sales beginning in October 2001. This entailed withholding approval of the pricing mechanism until after the oil had been lifted -- when it could be determined what the true fair market value of the oil was at the time of the actual lifting. Retroactive pricing made it less profitable for buyers to pay surcharges, and Iraq's gains from surcharges decreased over time as fewer companies chose to lift oil. By the Fall of 2002, the surcharge demands ceased.

**Chevron's Purchases of Iraqi Oil on Which Surcharges Were Paid**

18.    Chevron purchased oil from third parties that had access to Iraqi oil allocations under the Oil for Food Program. From April 17, 2001 through May 6, 2002, Chevron purchased approximately 78 million barrels of crude oil from Iraq pursuant to 36 contracts with third parties. The crude oil purchased from Iraq was primarily Basrah light, which was well suited to the capabilities of Chevron's refineries and was usually considerably less expensive than other crude oils available on the market.

19.    During the relevant period, Chevron's traders entered into oil transactions with third parties that included the payment of illegal surcharges to Iraq. Chevron knew or should have known that the illegal surcharge payments were passed back to Chevron as part of the inflated premiums paid to third parties for the purchase of Iraqi oil. At least one trader responsible for a large portion of Chevron's purchases from Iraq factored the cost of the surcharge payments into the price negotiations with third parties.

6

20.    In January 2001, after learning of Iraq's surcharge demands, Chevron implemented a company-wide policy prohibiting the payment of surcharges in connection with the purchase of Iraqi oil from third parties. Among other things, the policy required traders to obtain prior written approval for all proposed Iraqi oil purchases from Chevron's Director of Global Crude Trading, and charged management with reviewing each proposed Iraqi oil deal to ensure that there was no reason to believe that a surcharge had been or would be paid.

21.    As part of the process for reviewing proposed Iraqi oil purchases, Chevron's management was to consider, among other things, the identity, experience and reputation of the third party, as well as whether the proposed pricing basis or margin deviated from historical practice. If a proposed third party purchase was approved by Chevron, the new policy also required the third party to certify that no illegal payments had been or would be made in connection with its acquisition of crude oil from Iraq.

22.    Chevron's trader did not follow the company-wide policy against surcharge payments to Iraq and Chevron's management was unsuccessful in ensuring its compliance. Despite being required to consider the identity, experience and reputation of a third party seller prior to approving a proposed Iraqi oil purchase, Chevron's management relied in Iraqi oil deals on its trader's representations.

23.    In one such instance, a credit check by Chevron of a proposed third party seller revealed that the seller, which was located in Switzerland, was a "brass plate company." This meant that the company had no experience in the oil business, no real business operations, and had no known assets. Despite concerns on the part of Chevron's management, Chevron entered into two transactions to purchase three million barrels of

7

oil from the third party in January 2002, paying a premium of $0.415 cents per barrel.
The decision to do business with a "brass plate company" was not given sufficient weight
under Chevron's own internal policy on Iraq. Illegal surcharges were paid on both of
these transactions, and passed back to Chevron in inflated premiums.

24.     During the relevant period, Chevron also knew or should have known that
it was paying inflated premiums to third parties that included the costs of surcharge
payments to Iraq. Chevron's premium payments to third parties increased after Iraq's
surcharge demands began in approximately August 2000, and remained inflated until the
surcharge policy ended. Shortly before the surcharge policy began, Chevron's premiums
to third parties typically ranged from $0.25 to $0.28 cents per barrel. After the surcharge
policy was implemented, Chevron's premiums rose as high $0.53 per barrel and ranged
from $0.36 to $0.495 cents per barrel.

25.     Despite the obvious increase in premiums, Chevron's management
routinely approved the Iraqi oil purchases proposed by Chevron's traders.

26.     One third party seller based in Italy whose company on occasion sold oil
to Chevron pursuant to the Oil for Food Program, stated that the trader he dealt with at
Chevron and the trader's bosses always knew about the illegal surcharge demands by
Iraq. At one point the Chevron trader asked the third party seller to persuade Iraq to
reduce the amount of its surcharges. According to this witness, the Chevron trader knew
what portion of Chevron's premiums went to the third party seller as well as what portion
the third-party seller paid to SOMO as a surcharge.

27.     Chevron's own internal documents show that it was well aware of the
costs of doing business with Iraq. In an e-mail dated November 14, 2001, a Chevron

contracts employee e-mailed one of the traders after receiving a request for a price confirmation on a contract with a third party seller. The seller wanted confirmation that the premium due from Chevron on a specific contract was $0.33 cents per barrel. The Chevron employee was confused by the price confirmation request because, in October 2001, the parties had agreed that Chevron would pay a premium of $0.41 cents per barrel under the contract. The Chevron employee e-mailed the trader in charge of the deal seeking clarification and asking whether the correct premium to be paid under the contract was $0.33 or $0.41 cents per barrel. That same day, the trader e-mailed her back with the following message:

> Very interesting...looks to me as though they have inadvertently given us the details of their purchase cost from SOMO. You can ignore the number. The 41 cents still stands.

The e-mail shows that the trader was aware of SOMO's kickback costs, i.e., the 33 cents, and the fact that Chevron was paying those costs as part of its premium of 41 cents.

28. Illegal surcharge payments of approximately $20 million were paid by third parties on the thirty-six transactions involving Chevron's purchases of 78 million barrels of Iraqi crude from those third parties under the Oil for Food Program.

### Chevron's Failure to Maintain Adequate Internal Controls

29. After becoming aware of the Iraqi demands and collection of illegal surcharges on crude oil sales, Chevron failed to maintain a system of internal controls sufficient to ensure that the company's transactions were executed in accordance with management's authorization and that the transactions would be recorded as necessary to maintain accountability for the Company's assets. Moreover, despite Chevron's policy

of not purchasing Iraqi oil from third parties that paid kickbacks, the company sometimes failed to adhere to the policy when conducting due diligence on its contract partners beyond asking for a certification that Chevron officials knew or should have known was ineffective. Thus, Chevron failed to implement a system of internal controls to detect and prevent such illicit payments.

### Chevron's Failure Properly to Account for Its Purchases of Iraqi Crude Oil

30.     Chevron's accounting for its Oil for Food transactions failed properly to record the nature of the Company's payments to third parties. In at least thirty-six transactions, a portion of the Company's purchase price for Iraqi crude oil constituted surcharge payments to Iraq in violation of U.N. regulations and U.S. and international trade sanctions. The company failed to so designate those payments, characterizing them instead simply as premiums. Thus, Chevron failed to accurately record these payments in its books, records, and accounts.

### CLAIMS FOR RELIEF

### FIRST CLAIM

### [Violations of Section 13(b)(2)(A) of the Exchange Act]

31.     Paragraphs 1 through 30 are realleged and incorporated by reference.

32.     As described above, Chevron, through its officers, agents and subsidiaries, failed to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

33.     By reason of the foregoing, Chevron violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## SECOND CLAIM

### [Violations of Section 13(b)(2)(B) of the Exchange Act]

34.     Paragraphs 1 through 33 are realleged and incorporated by reference.

35.     As described above, with respect to illegal surcharge payments made in connection with Chevron's purchases of Iraqi crude oil, Chevron failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:  (i) payments were made in accordance with management's general or specific authorization; and (ii) payments were recorded as necessary to maintain accountability for its assets.

36.     By reason of the foregoing, Chevron violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A.     Permanently restraining and enjoining Chevron from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act  [15 U.S.C. §§ 78m(b)(2)(A) and (B)];

B.     Ordering Chevron to disgorge ill-gotten gains, with prejudgment interest, wrongfully obtained as a result of its illegal conduct;

C.     Ordering Chevron to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

D.     Granting such further relief as the Court may deem just and appropriate.


Dated: *Nov. 14* , 2007


*Reid A. Muoio*

Reid A. Muoio (RM 2274)
Cheryl J. Scarboro
Tracy L. Price
Denise Y. Hansberry

100 F Street, NE
Mail Stop 6030
Washington, DC  20549-6030
(202) 551-4403 (Scarboro)

Attorneys for Plaintiff,
Securities and Exchange Commission